| | | |
|---|---|---|
| **ABUY DEVELOPMENT, L.L.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:06CV799SNL** |
| | ) | |
| **YUBA MOTORSPORTS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff filed this declaratory judgment action seeking a declaration, that pursuant to the YCM Operating Agreement between the parties, and more specifically, pursuant to Section 3.4 of said agreement, defendant is a "Defaulting Member" and plaintiff is entitled to exercise its right to adjust the Capital Accounts and Percentage Interests; thereby, adjusting defendant's capital account to 0% making plaintiff the 100% owner of YCM. This matter is before the Court on several dispositive motions: 1) plaintiff's motion for summary judgment (#14), filed April 12, 2007; 2) plaintiff's motion for summary judgment on defendant's counterclaim[1] (#22), filed May 10, 2007; and 3) defendant's motion for partial summary judgment[2] (#24), filed May 10, 2007. Extensive responsive pleadings to all three (3) pending motions by both parties have now been filed. On August 28, 2007, due to the complex and interwoven nature of these motions, the Court held a one(1) day hearing for counsel to briefly argue a condensed version of their positions. Depending upon the final resolution of these motions, the Court will reset this case, if necessary.

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th

---

[1]This motion seeks summary judgment on defendant's Counterclaims 1-3; i.e., Counterclaim 1- breach of fiduciary duty; Counterclaim 2- breach of contract; and Counterclaim 3- declaratory judgment.

[2]This motion seeks summary judgment only as to Counterclaim 3 - declaratory judgment.

Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Citrate, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976).

Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." Hindman v. Transkrit Corp., 145 F.3d 986, 990 (8th Cir. 1998)(citations omitted); *see*, Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003) *citing* Keathley v. Ameritech Corp., 187 F.3d 915, 919 (8th Cir. 1999). However, it is clear that to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. Putnam v. Unity Health Systems, Inc., 348 F.3d 732, 733-34 (8th Cir. 2003) *quoting* Wilson v. Int'l Bus. Mach. Corp.,

62 F.3d. 237, 241 (8th Cir. 1995); <u>Girten v. McRentals, Inc.</u>, 337 F.3d. 979, 982 (8th Cir. 2003)(plaintiff's theory of age discrimination failed "[b]ecause this theory is supported more by contentions and speculation than evidence, it is insufficient to withstand summary judgment.").

After thoroughly reviewing the voluminous, and somewhat redundant, pleadings filed in connection with these pending motions, and the numerous exhibits, and upon review of the Court's notes of the August 28, 2007 hearing, the Court finds the following facts applicable to the issues raised by these motions.

Plaintiff Abuy is a Delaware limited liability company with its principal place of business in Illinois. Defendant Yuba is a California corporation with its principal place of business in California. YCM is a Delaware limited liability company formed for the purpose of developing a motorplex in Yuba County, California. At the time of YCM's formation, Abuy and Yuba were each 50% members of YCM.

In May 1998, the parties entered into an Operating Agreement for YCM, which was later amended in September 1998. Jon Cantor served as counsel for Yuba in the negotiation and drafting of the YCM Operating Agreement; Julia Turrini served as counsel for Abuy in the negotiation and drafting of the YCM Operating Agreement.

YCM was initially capitalized by Abuy contributing $611,643.51 in cash and Yuba receiving credit in an equal amount for certain preliminary work it did on the project. Additional capital contributions to YCM could be required if the managers determined that they were "necessary or appropriate for the conduct of" of YCM's business. Operating Agreement, §3.2 and §3.3. After the initial capital contributions under Section 3.1 of the Operating Agreement, pursuant to §3.2 of the Operating Agreement, each member was then required to contribute an additional $2,165,860.02 to fund YCM's acquisition of real property on which the motorplex was to be developed. Abuy made its property acquisition capital contribution in cash and, under the Operating Agreement, loaned Yuba the identical amount to enable it to make a property acquisition capital contribution in the same amount. Following the contributions made pursuant to §§3.1 and 3.2, all additional capital contributions were governed by §3.3 of the Operating Agreement.

Section 3.3. of the YCM Operating Agreement provides:

> 3.3 **Additional Capital Contributions**. Except for the Capital Contributions required pursuant to Section 3.1 and 3.2, no Member shall be required to make any additional Capital Contributions to the Company. To the extent approved by the Managers, from time to time, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire, if the Managers determine that such additional Capital Contributions are necessary or appropriate for the conduct of the Company's business, and upon such terms and conditions as the Managers may determine. In that event, the Members shall have the opportunity, but not the obligation, to participate in such additional Capital Contributions on a pro rata basis in accordance with their Percentage Interests. Immediately, following such Capital Contributions, the Percentage Interests shall be adjusted to reflect the new relative proportions of the total Capital Contributions of the Members.

The Operating Agreement further provided that all business and property acquisition decisions require the majority approval of the Managers from each Member "provided, that at least one Manager appointed by Yuba and one Manager appointed by Abuy shall have approved such decision or action." Operating Agreement, §5.1. Frank Arciero, Sr. was the Manager appointed for Yuba to make such decisions on behalf of Yuba.

On or about February 16, 2000, pursuant to an executed Written Action of the Members of YCM, Abuy made a cash capital contribution of $1,000,000.00 to YCM on its own behalf. Pursuant to the terms of an executed promissory note by Yuba and Abuy, Abuy loaned $1,000,000.00 to Yuba with which Yuba used to fund its capital contribution to YCM..

On or about May 5, 2000, pursuant to an executed Written Action of the Members of YCM, Abuy made a cash capital contribution of $1,500,000.00 to YCM on its own behalf. Pursuant to the terms of an executed promissory note by Yuba and Abuy, Abuy loaned $1,500,000.00 to Yuba with which Yuba used to fund its capital contribution to YCM.

On or about July 31, 2001, pursuant to an executed Written Action of the Members of YCM, Abuy made a cash capital contribution of $1,754,415.11 to YCM on its own behalf. Pursuant to the terms of an executed promissory note by Yuba and Abuy, Abuy loaned $1,754,415.11 to Yuba with which Yuba used to fund its capital contribution to YCM.

The funds loaned to Yuba by Abuy on February 16, 2000, May 5, 2000, and July 31, 2001 were not paid directly to Yuba but rather were deposited in YCM's account. In tandem with the

4

execution of each of the promissory notes, a "pledge agreement" was executed by the parties wherein Yuba's interest in YCM was collateral for the promissory notes.

By 2001, it was becoming apparent that the motorplex project would never be developed primarily due to lack of NASCAR approval. Consideration was turned to using the property for an entertainment complex, including a casino. There was also discussions with Sage Development regarding a residential development on the subject property.

In 2003, Abuy made demand for payment in full on the outstanding promissory notes executed by Yuba. When payment was not forthcoming, Abuy filed suit against Yuba and its principal, Frank Arciero, Sr., in the Circuit Court of Lake County, Illinois.[3] Pursuant to the promissory notes and the pledge agreements, Abuy sought not only repayment in full for each of the loans, but also in addition, sought to foreclose on the security for the notes; i.e. Yuba's membership interest in YCM. Abuy's Illinois State Complaint, Exhibit A to Document #25.

In May 2005, Abuy moved for summary judgment in its Illinois state case seeking a declaration of default on all of the outstanding promissory notes and a transfer of Yuba's membership interest in YCM under the Pledge Agreement(s). On or about August 30, 2005, the Illinois state court granted Abuy's summary judgment motion, including ordering a transfer of Yuba's membership interest to Abuy. On or about September 29, 2005 Yuba moved for reconsideration of the Illinois state court's order regarding that portion transferring Yuba's membership interest in YCM to Abuy. On April 11, 2006 the Illinois state court granted Yuba's motion for reconsideration and set aside that portion of its prior order permitting the transfer of Yuba's membership interest in YCM to Abuy. The Illinois state court found that the Pledge Agreement(s) did not provide for such a transfer absent a foreclosure sale.

While the state lawsuit was pending, on or about April 28, 2006, Abuy provided Yuba and YCM with formal notice that it was adjusting Abuy's and Yuba's Capital Accounts and Percentage Interests based upon Yuba's "default" on the loans Abuy had made to Yuba funding Yuba's additional Capital Contributions. Abuy believed it was entitled to make the adjustment,

---

[3]Abuy Development, L.L.C. v. Yuba Motorsports, Inc., et. al., Case No. 04L170 (Circuit Court for Lake County, Illinois).

which essentially gave Abuy 100% membership in YCM, based upon Section 3.4 of the Operating

Agreement.   Section 3.4 provides:

> 3.4   **Failure to Make Capital Contributions**.  In the event any
> Member (a "Defaulting Member") shall fail to make any Capital
> Contribution when required pursuant to the provisions of Section 3.3,
> then the other Members (the "Non-Defaulting Members") shall have
> the right, but not the obligation, to make the Capital Contribution which
> is not made on a timely basis by the Defaulting Member. Each Non-
> Defaulting Member which elects to make a Capital Contribution for
> the Defaulting Member pursuant to this Section 3.4 shall have the
> right to make that proportion of such Capital Contribution as is equal
> to the Percentage Interest of such Non-Defaulting Member as compared
> to the Percentage Interests of all Non-Defaulting Members electing
> to make such Capital Contribution.  Any Capital Contribution made
> by any Non-Defaulting Members for a Defaulting Member shall be
> treated as a loan by the Non-Defaulting Member to the Defaulting
> Member , which loan shall accrue interest at the per annum rate equal
> to two percent (2%) plus the prime rate quoted by the Wall Street Journal
> from time to time and shall be due and payable by the Defaulting Member
> to the Non-Defaulting Member in cash upon the earlier of (a) seven (7)
> days from demand for payment by the Non-Defaulting Member, or (b)
> thirty (30) days from the date the Non-Defaulting Member made such
> Capital Contribution to the Company.  If the Defaulting Member pays
> the Non-Defaulting Member the amount equal to the Capital Contribution
> made to the Company by the Non-Defaulting Member, together with
> interest accrued thereon, on or before the maturity date therefore, then
> the Defaulting Member shall be deemed to have made the Capital
> Contribution on and as of the date the Non-Defaulting Member
> initially made such Capital Contribution to the Company for the
> Defaulting Member.  If the Defaulting Member fails to pay the Non-
> Defaulting Member the amount equal to the Capital Contribution made
> to the Company by the Non-Defaulting Member, together with all
> interest accrued thereon, on or before the maturity date therefore, then the
> Non-Defaulting Member may elect, by delivery of notice to the
> Defaulting Member and the Company, to adjust the Capital Accounts of
> the Defaulting Member and the Non-Defaulting Member to reflect that
> the Non-Defaulting Member has made such Capital Contribution on its
> own behalf and not on behalf of the Defaulting Member thereby
> increasing the Percentage Interest of the Non-Defaulting Member and
> reducing the Percentage Interest of the Defaulting Member to reflect
> such adjustment made to the Capital Accounts of the Defaulting Member
> and the Non-Defaulting Member.

Subsequent to providing said notice of enforcement of Section 3.4 of the Operating

Agreement, Abuy moved in Illinois state court for entry of final judgment.  On or about

September 14, 2006, having found Yuba in default of the promissory notes and Pledge

Agreement(s), the Illinois state court entered judgment in the sum of $7,832,225.10, plus interest

at the daily rate of $2164.17 from April 29, 2006 until the date of judgment, plus attorneys' fees of $400,000.00. Exhibit G to Document #25.

On or about May 17, 2006 Abuy filed this declaratory judgment action, that pursuant to the YCM Operating Agreement, its exercise of the right to adjust the Capital Accounts and Percentage Interests of the members, pursuant to Section 3.4 of the Operating Agreement, was proper and that Abuy is the sole legal 100% owner of YCM. The YCM Operating Agreement is governed by Delaware law. Under the Delaware Limited Liability Act, "[a] limited liability company agreement may provide that an interest of any member who fails to make any contribution that the member is obligated to make shall be subject to penalties for, or specified consequences of such failure. Such penalty or consequence may take the form of reducing or eliminating the defaulting member's proportionate interest in a limited liability company . . ." 6 Del.Code. §18-502(c).

Finally, Abuy, if found to be the prevailing party in this action, is entitled to recover its attorneys' fees incurred in litigating this matter pursuant to Section 12.12 of the Operating Agreement.

Without dispute, the applicability of Section 3.4 is the primary issue in this lawsuit.[4] Abuy asserts that it had a legal right under Section 3.4 to adjust the Capital Accounts thereby rendering it the 100% owner of YCM because Yuba has defaulted on repayment of the subject loans made pursuant to Section 3.3 of the Operating Agreement. It argues that the phrase "Defaulting Member" in §3.3 of the Operating Agreement is ambiguous, therefore, the Court can and should consider the testimony of the parties' counsel (at the time of the drafting of the Operating Agreement) as to the intent of the parties in drafting this section. Yuba, on the other hand, believes that §3.4 is not applicable because it did make its required Capital Contributions using the loaned monies; and furthermore, the phrase "Defaulting Member" is unambiguous and extrinsic evidence should not be considered by the Court. Yuba further argues that Abuy is both judicially and collaterally estopped from asserting this declaratory judgment action due to

[4]The Court will take up the matter of Yuba's counterclaims later in this memorandum.

7

"statement" made in the Illinois state court case that the loans were made to allow Yuba to make its Capital Contributions; and that the Illinois state court has already disallowed the transfer of Yuba's membership interest in YCM to Abuy.

**Applicability of Section 3.4 of the Operating Agreement**

Under Delaware law, the construction of contract language is a question of law. *See*, Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co., 616 A.2d. 1192, 1195 (Del. 1992). When interpreting a contract, the court's role is to effectuate the parties' intent. Lorillard Tobacco Co. v. American Legacy Foundation, 903 A.2d. 728, 739 (Del.Supr. 2006). The primary consideration of the reviewing court is to "attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted." Comrie v. Enterasys Networks, Inc., 837 A.2d. 1, 13 (Del.Ch. 2003). When addressing a dispute involving contract interpretation, "the court must first examine the entire agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous." Comrie, at 13 *citing* In re Explorer Pipeline Co., 781 A.2d. 705, 713 (Del.Ch. 2001); *see also*, Intel Corp. v. Broadcom Corp., 173 F.Supp.2d. 201, 220 (D.Del. 2001) *citing* E.I. duPont de Nemours and Co. v. Shell Oil Co., 498 A.2d. 1108, 1113 (Del. 1985). "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language of the contract its ordinary meaning." Intel Corp., at 221 *citing* Rhone-Poulenc Basic Chem. Co., at 1195. The reviewing court should only consider extrinsic evidence to interpret a contract only if it finds that there is ambiguity in the contract. Intel Corp., at 220-21 *citing* Pellaton V. Bank of New York, 592 A.2d. 473, 478 (Del. 1991).

Ambiguity does not exist simply because the parties cannot agree on what a contract means.

> "A contract is not rendered ambiguous simply because
> the parties do not agree upon its proper construction. Rather,
> a contract is ambiguous only when the provisions in controversy
> are reasonably or fairly susceptible of different interpretations or
> may have two or more different meanings. Ambiguity does not
> exist where the court can determine the meaning of a contract
> `without any other guide than a knowledge of the simple facts
> on which, from the nature of language in general, its meaning
> depends.' Courts will not torture contractual terms to impart

> ambiguity where ordinary meaning leaves no room for uncertainty.
> The true test is not what the parties to the contract intended it to
> mean, but what a reasonable person in the position of the parties
> would have thought it meant."

Rhone-Poulenc Basic Chem. Co., at 1196 (internal citations omitted).; *see*, Lorillard Tobacco Co., at 739 *citing* Rhone-Poulenc Basic Chem Co., *supra*.; *see also*, United Rentals, Inc. v. Ram Holdings, Inc., 937 A.2d. 810, 830 (Del.Ch. 2007).   Extrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning.  United Rentals, at 830 *citing* Eagle Indus., Inc. v. DeVilbiss Health Care, 702 A.2d. 1228, 1230 (Del. 1997).  When a contract is ambiguous, it raises " factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties." Eagle Indus., at 1230.  Once having determined that a contract or a provision within is ambiguous, the court may permit the parties to introduce evidence of the negotiation process including "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry."  United Rentals, at 834-35 (citations omitted); *see also*, Pellaton, at 478; Comrie, at 13 *citing* Supermex Trading Co., Ltd. v. Strategic Solutions Group, 1998 WL 229530, at *3 (Del.Ch. May 1, 1998).

> "This evidence may lead to `a single `correct' or single
> `objectively reasonable' meaning.' Restated, the extrinsic
> evidence may render an ambiguous contract clear so that an
> `objectively reasonable party in the position of either bargainer
> would have understood the nature of the contractual rights and
> duties to be.' In such a case, the [c]ourt would enforce the
> objectively reasonable interpretation that emerges."

United Rentals, at 835 (internal citations omitted).  When making a determination regarding this "shared intent" of the parties to an ambiguous contract, a court must still adhere to [Delaware's] objective theory of contracts.  United Rentals, at 835; Haft v. Haft, 671 A.2d. 413, 417 (Del.Ch. 1995).  When a review of the extrinsic evidence does not lead the court to an obvious, objectively reasonable conclusion, the court may apply another principle: "the forthright negotiator principle".  United Rentals, at 835; Comrie, at 13.  Under this principle, only an objectively reasonable interpretation that is in fact held by one side of the negotiation and which the other side knew or should have known of such interpretation can be enforced as a contractual duty.  United Rentals,

*supra.*; Comrie, *supra.* "In other words, the forthright negotiator principle provides that, in cases where the extrinsic evidence does not lead to a single, commonly held understanding of a contract's meaning, a court may consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party." United Rentals, at 836 (citations omitted). "This principle is capable of resolving disputes arising from ambiguous contract language because it is logically impossible for a contracting party, operating in good faith, *both* to have a subjective interpretation of ambiguous language different from that of [its] counterparty *and* to know of [its] counterparty's differing interpretation." Comrie, at 13 (citations omitted).

After careful review of the parties' pleadings, the voluminous exhibits submitted, and the arguments at hearing, the Court finds that the term "Defaulting Member" as used in Section 3.4 of the Operating Agreement is ambiguous. Defendant Yuba argues that "Defaulting Member" is unambiguous because it refers only to a Member who fails to make a Capital Contribution which it argues it did so with regard to the three (3) subject contributions; however, plaintiff Abuy counterargues that as the term "Defaulting Member" is used in §3.4, it refers to any Member who cannot make such Capital Contributions from its own funds but rather such contributions are made with "loaned" funds from another Non-Defaulting Member. Since the Operating Agreement does not actually define "Defaulting Member" except to make reference to its usage in Section 3.4 and since this language is fairly susceptible to two different, yet reasonable, interpretations, the term "Defaulting Member" is ambiguous.

Since neither of the interpretations of the term "Defaulting Member" and its application as to §3.4 of the Operating Agreement can be gleaned from a plain reading of the Operating Agreement, the Court will consider the relevant extrinsic, parol evidence offered by the parties. The principals of the corporate parties to this lawsuit are seasoned business persons, not novices in the art of contract negotiations. They were represented by counsel throughout the negotiation process and counsel's testimony is most telling of the understanding of the contract terms,

especially as to the intent and application of §3.4 of the Operating Agreement.  Jon Cantor[5] and

Julie Turrini[6], drafters of the Operating Agreement testified as follows:

### Testimony of Jon Cantor[7]

Q. (Plaintiff's counsel): Well, one of the remedies for those other
loans, the additional capital contributions, was that, if Frank [defendant
Yuba's principal] did not have or elect not to contribute cash, he
was going to have to borrow the money.  And if he defaulted in
repaying those borrowings, he bore the risk of potentially losing a
part or all of his interest in YCM; correct?

[Witness Cantor asked for a received a copy of the Operating Agreement
before answering]

A.  Okay.  Under 3.2 the infrastructure improvements capital
contribution, that's where Gerry [plaintiff Abuy' principal] was
advancing the initial funds.  And on those funds that he advanced on
3.2, the remedies and security that he obtained are set forth in that
particular paragraph.

Q.  Okay.

A.  As it relates to additional capital contributions, which are
different that infrastructure improvements capital contributions,
there were other remedies - there are different remedies available
to Gerry as spelled out in that agreement.  And under 3.3 there was
a provision that, if Gerry advanced funds on behalf of Frank, on behalf
of Arciero --strike that.
      If there was a call by the managers to contribute additional capital
and Frank elected not to do that and Gerry advanced the money, he could
do that as a loan.  And if there was a demand to pay it back and Frank
elected not to pay it back, then under the 3.3 provisions, he could stand
to lose his rights in the L.L.C. [YCM].

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A.  If you look at 3.3, "In the event the members shall have the
opportunity, but not the obligation, to participate in such additional
capital contributions on a pro rata basis in accordance with their
percentage interests.  Immediately following such capital
contributions, the percentage interests shall be adjusted to
reflect the new relative proportions of the total capital
contributions of the members."
      So the way that was written is, if basically they decided they

---

[5]Arciero/Yuba counsel who participated in the negotiation and drafting of the Operating
Agreement.

[6]Abuy's counsel who participated in the negotiation and drafting of the Operating
Agreement.

[7]Exhibit A to Document #15.

needed additional capital contributions of $2 and Frank didn't want to put up his dollar and Gerry put up his $2 and said, "Okay, I am not call it a loan", then it seems to me that his percentage interest could be adjusted. Okay?

Q. I see. I see the difference. You are saying that, if Frank said, "I don't have the money or I don't want to invest the money, but I want to borrow the money to make that so therefore it is a loan," then Frank would avoid the dilution that 3.3 would call up until the point where the loan would be due.
    If he didn't pay when the loan was due, then the adjustment could occur under 3.4.

A. Yes.

Cantor Deposition, pgs. 35-38.

### Testimony of Julia Turrini[8]

Q. Now, we've had a lot of discussion today about the terminology "additional capital contributions" and you've referred us, and Mr. Spach asked you some questions about that and the meaning of that in the operating agreement.
    Do you generally recall that?

A. Yes.

Q. Is it your understanding that the terminology "additional capital contributions" as used in the operating agreement and the amended operating agreement are governed by Section 3.3 of the operating agreement?

A. Yes.

Q. Just for clarification, I believe you testified that from your general involvement in work on the February 16th and May 5th, 2000 notes it was your general understanding that the - - the funds were needed by YCM for general operating and project-related expenses?

A. That was my - - that's my general memory.

Q. Okay. And, again, I believe you already said this, but just to confirm, the capital contributions and related loans associated with the February 16th and May 5th, 2000 notes, were those contributions made pursuant to Section 3.3 of the operating agreement?

A. That was my general understanding, that they were made - - they were additional capital contributions.

Q. And, therefore, made pursuant to Section 3.3.?

---

[8]Exhibit B to Document #15.

A. Yes.

Q. Let me ask you a little bit - - a couple of questions about the drafting of the operating agreement and amended operating agreement.
   I believe you testified that you had a number of conversations with Mr. Cantor with respect to those two documents and the negotiations of them; is that right?

A. Yes.

Q. And, while I recognize you didn't recall specific conversations, you do have a general recollection of the general negotiation process; is that right?

A. Yes.

Q. Okay. In your experience of how 15 to 20 years as a transactional lawyer have you come to have heard of the terminology "a squeeze-down provision"?

A. Yes.

Q. And in connection with your experience are squeeze-down provisions used typically in LLC or other joint venture agreements?

A. Yes. They're a pretty typical provision to include in a partnership agreement or an operating agreement.

Q. What is a "squeeze-down provision"?

A. A "squeeze-down provision" is a provision that usually relates to additional capital calls that one member may not have the cash to come up and make that capital call, so that a - - typically, you know, a defaulting member or partner, and the provision would give the nondefaulting members or partners the right to make the capital contribution on behalf of the defaulting member, and the remedy is usually the squeeze-down provision, which provides the nondefaulting member who has made that loan remedy if the defaulting member has not repaid that loan to adjust capital accounts accordingly.

Q. Okay. And, if I understand your testimony correctly, is the purpose of a squeeze-down provision in part to permit a - - strike that.
   Is the purpose of a squeeze-down provision in part to allow a mechanism for reducing one partner's ownership interest for failing to repay a loan made for the purpose of a capital contribution if they don't repay it pursuant to the terms of the loan?

A. That's - - that's correct.

Q. Okay. And based on your general negotiations and discussions with Mr. Cantor, was Section 3.4 of the YCM operating agreement a squeeze-down provision?

A. Yes.

[Objection made by Mr. Spach, Yuba's counsel, as to vagueness and ambiguity of question and answer. Mr. Fogel, Abuy's counsel, rephrases the question.]

Q. Was the purpose and intent of the inclusion of Section 3.4 in the YCM operating agreement to permit the squeeze-down remedy in the event that one member borrowed funds to make an additional capital contribution and failed to repay that loan pursuant to the terms of the borrowing?

A. That's my understanding.

Q. And that was a provision that - - based on your general negotiations that you and Mr. Cantor had was incorporated into the YCM operating agreement?

A. Yes.

Q. Now, you referenced in an answer to a question a minute ago the terminology "defaulting member" and "nondefaulting member" and those are terms that are included in Section 3.4.
    Do you remember that?

A. Yes.

Q. Okay. And do I have it correct that the operating agreement defines the "defaulting member" as a member who does not have the cash available or doesn't want to invest the cash to make an additional contribution but borrows it from the other member?

[Mr. Spach objects to the form of the question and Mr. Fogel directs Ms. Turrini to answer.]

A. Yes.

Q. Okay. And - -

[Mr. Spach moves to strike.]

Q. And if the "defaulting member" as defined - - as you just defined it as included in the operating agreement repays the loan made for the purpose of the capital contribution consistent with the borrowing terms, do they retain their relative ownership interest?

A. Yes.

Q. What happens if they fail to repay the loan consistent with the terms of the borrowing that they made for purposes of the additional capital contribution?

[Mr. Spach again objects as to relevancy and Mr. Fogel directs Ms. Turrini to answer but then elects to rephrase the question.]

Q. If a member borrows funds to make an additional capital contribution and fails to repay those funds pursuant to the terms of the borrowing, what is the consequence under a squeeze-down

14

provision like 3.4 of the YCM operating agreement?

[Mr. Spach again objects to form of the question and Mr. Fogel directs Ms. Turrini to answer.]

A. If the member fails to repay the loan, then Section 3.4 of this agreement, like other squeeze-down provisions, would trigger an adjustment to the capital accounts.

Q. And so, for example, if Yuba failed to timely repay the loans made for capital contributions that we talked about in the February 16th 2000 note and May 5th, 2000 note, then Abuy would have the right, if it elected to do so, to adjust the capital accounts as set forth in

Section 3.4 of the operating agreement?

[Counsel debate whether question calls for a legal conclusion prior to witness answering.]

A. The Section 3.4 in my understanding says that if there is a loan for an additional capital contribution made by a nondefaulting member and to a defaulting member, and if the defaulting member fails to repay that loan when due, then the squeeze-down provisions in Section 3.4 would be triggered.

Turrini Deposition, pgs. 75-82.

Both counsel for the parties, who were instrumental in negotiating and drafting the terms of the Operating Agreement, consistently testified that Section 3.3 governed the making of additional capital contributions by the Members, and the right (but not obligation) of one Member to loan funds to another Member, who has expressed an unwillingness for whatever reason, to make an agreed-upon additional capital contribution to YCM. Furthermore, and more importantly, both counsel consistently testified that §3.4 of the Operating Agreement provided the remedy for a Member who has loaned funds to another Member to make a capital contribution but is not repaid in a timely manner. This remedy, which both counsel agreed existed pursuant to §3.4, was an adjustment to the capital accounts of each of these Members. Given counsels' clear and unequivocal testimony, a Member who loans funds to another Member is a "Non-Defaulting Member" and the Member who receives the funds but fails to repay said funds; i.e., loan, is a "Defaulting Member".

Furthermore, this interpretation and the consequence of losing ownership interest if loans made under §3.3 were not repaid was communicated to Mr. Arciero.

15

**Testimony of Frank Arciero[9]**

Q. [Mr. Fogel, Abuy's counsel] So would it be fair to say that as to any of the terms in that agreement [Operating Agreement], because Mr. Cantor drafted and negotiated it, you would refer to his testimony on that subject?

A. Yes.

Arciero Deposition, pgs. 30-31.

**Testimony of Jon Cantor[10]**

Q. [Mr. Fogel, Abuy's counsel] But do you recall that one of the remedies that Abuy had under the operating agreement about which you were personally concerned as Mr. Arceiro's counsel was that, if Yuba defaulted on its borrowing from Abuy, Abuy would have the right to take Yuba's interest in YCM and Yuba could lose his whole position in YCM?

A. We did discuss that.

Cantor Deposition, pg. 34.

Given the undisputed facts that 1) additional capital contributions were agreed upon to be made to YCM by the Members pursuant to §3.3; 2) Abuy made its capital contributions out of its own funds and loaned an equal amount of funds to Yuba who had voluntarily chosen not to itself fund its own capital contributions; 3) that said loaned funds were directly deposited into YCM's account by Abuy; 4) that despite a proper notice under §3.4 for repayment of the loans, Yuba failed to repay; and 5) the Illinois state court found Yuba to be "in default" for non-payment of said loans, this Court finds that pursuant to Section 3.4 of the Operating Agreement, Abuy, as the Non-Defaulting Member, has the right to adjust the capital accounts of itself and Yuba, as the Defaulting Member, upon the failure of Yuba to repay the subject loans.

This construction is not only in accordance with the testimony of the parties' counsel as to the intent of the parties in negotiating and drafting the Operating Agreement, but is a proper and legal contract provision pursuant to Delaware law. 6 Del.Ch §§306, 502(c).

---

[9]Exhibit C to Document #15.

[10]Exhibit A to Document #15.

Abuy has shown by a preponderance of the evidence that, pursuant to §3.3 of the Operating Agreement, monies were loaned by Abuy to Yuba for the purposes of additional capital contributions, and that Yuba has failed to repay these monies. Furthermore, Abuy has shown by a preponderance of the evidence that under the facts of this case, and pursuant to §3.4 of the Operating Agreement, Abuy as the Non-Defaulting Member had the right to adjust the capital accounts of itself as the Non-Defaulting Member and Yuba as the Defaulting Member due to the failure of Yuba to timely repay said loans. Finally, Abuy has shown by a preponderance of the evidence, that Yuba knew or should have known that §3.4 was a legal and proper "squeeze-down provision" by which a defaulting member of a limited liability company could lose its ownership interest in said company for failure to repay loans made pursuant to the terms of the subject contract.

### Estoppel

In support of its position that Abuy cannot adjust the capital accounts pursuant to §§3.3. and 3.4 of the Operating Agreement, Yuba argues that Abuy is both judicially and collaterally estopped from arguing that the loans made pursuant to §3.3. can be the basis for the remedy it seeks pursuant to §3.4. It contends that in the Illinois state court action Abuy advanced the position that the loans were made to permit Yuba to make its "additional Capital Contributions"; thus, Abuy has conceded that Yuba is not a "Defaulting Member" under §3.4 of the Operating Agreement. This argument is meritless.

The doctrine of collateral estoppel is commonly considered to be a term which refers to "issue preclusion". Collateral estoppel is applicable to matters previously at issue which were directly and necessarily adjudicated. Lovell v. Mixon, 719 F.2d. 1373, 1376 (8th Cir. 1983) *citing* Montana v. United States, 440 U.S. 147 (1979). "Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979). Collateral estoppel does not require mutuality of parties as long as the party against whom it is used had a full and fair opportunity and incentive to litigate the issue in the prior action. Lane v. Peterson, 899 F.2d.

737, 741 (8th Cir. 1990); Sanders v. Frisbee, 736 F.2d. 1230, 1232 (8th Cir. 1984); see also, Munz v. Robert G. Parr, et.al., 972 F.2d. 971 (8th Cir. 1992). This bar includes not only claims/issues actually litigated, but also claims/issues that could have been raised in the previous action.

In Missouri[11], under the doctrine of collateral estoppel, four criteria must be met before a determination in the first action is preclusive in the second action:  1) the issue decided in the prior adjudication is identical to the issue in the present action; 2) the prior adjudication resulted in a judgment on the merits; 3) the party against whom collateral estoppel is asserted was a party to the prior adjudication; and 4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior lawsuit.  Farmland Industries v. Morrison-Quirk Grain, 987 F.2d. 1335, 1339 (8th Cir. 1993); Aetna Casualty & Surety Co. v. General Dynamics, 968 F.2d. 707, 711 (8th Cir. 1992); Tyler v. Harper, at 655; Baker v. McCoy, at 384 [both citing Oates v. Safeco Insurance Co. of America, 583 S.W.2d. 713, 719 (Mo.banc. 1979)].

The doctrine of collateral estoppel fails to preclude the instant lawsuit for the simple reason that the Illinois state court action adjudicated the issues of whether Yuba had "defaulted" on the loans secured by the promissory notes and the pledge agreement(s); and if so, what remedies were available to Abuy.  The application of the Operating Agreement, especially as to Sections 3.3.and 3.4 were not addressed.  The evidence before this Court shows that the Illinois state court rendered a final judgment finding that Yuba had failed to repay the monies loaned pursuant to the promissory notes and pledge agreement(s) and thus, was "in default".  Furthermore, the Illinois state court specifically found that although Abuy was entitled to repayment of said monies, plus interest; it was not entitled **under the pledge agreement(s)** to adjust the Capital Accounts due to the failure of repayment by Yuba.  Under these circumstances, the doctrine of collateral estoppel is inapplicable.

_____

[11]The parties agree, and the Court concurs, that in a diversity case such as this one, the substantive law of Missouri applies on the matter of estoppel.  *See*, Royal Ins. Co. of America v. Kirksville College of Osteopathic Medicine, Inc., 304 F.3d. 804, 807 (8th Cir. 2002); Nanninga v. Three Rivers Elec. Coop., 236 F.3d. 902, 906 (8th Cir. 2000); *see also*, Bendet, *infra*.

Judicial estoppel is a doctrine distinct from either doctrines of res judicata or collateral estoppel. State of New Hampshire v. State of Maine, 532 U.S. 742, 749 (2001); Leonard v. Southwestern Bell Corp. Disability Income Plan, 341 F.3d. 696, 702 (8th Cir. 2003) *citing* New Hampshire v. Maine, *supra*. The doctrine of judicial estoppel operates to protect the integrity of the judicial process by prohibiting parties from deliberately taking inconsistent positions in the same or related litigation. New Hampshire v. Maine, 532 U.S. at 750; Stallings v. Hussmann Corp., 447 F.3d. 1041, 1047 (8th Cir. 2006); Leonard, at 702; Bendet v. Sandoz Pharm. Corp., 308 F.3d. 907, 910 (8th Cir. 2002).

> "`Judicial estoppel prevents a person who states facts under oath during the course of a trial from denying those facts in a second suit, even though the parties in the second suit may not be the same as those in the first.' Therefore, a party that takes a certain position in a legal proceeding, `and succeeds in maintaining that position' is prohibited from thereafter assuming a contrary position `simply because his interests have changed,' especially if doing so prejudices the party `who acquiesced in the position formerly taken by him.'"

Stallings, at 1047 (internal quotations and citations omitted). There is no exhaustive formula for applicability of judicial estoppel, as different fact patterns may give rise to specific considerations. However, there are three (3) factors that should be considered in aiding the court in determining whether to apply the doctrine. Stallings, at 1047 *citing* New Hampshire v. Maine, 532 U.S. at 751. The three factors are as follows:

> "First, a party's later positions must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

Stallings, at 1047 *quoting* New Hampshire v. Maine, 532 U.S. at 750-51 (internal quotations and citations omitted).

Applying these principles, the Court finds that Abuy is not judicially estopped from pursuing its adjustment of the Capital Accounts under Section 3.4 of the Operating Agreement. The Court has carefully reviewed all the submitted exhibits and finds that Abuy has never wavered in its argument that it loaned monies to Yuba in which were used to make Yuba's additional capital contributions, and these monies were never repaid. Abuy's statements to the Illinois state court and to this Court are essentially the same, the only difference is the context in which they were made. In the Illinois state action, Abuy not only sought repayment but also an adjustment of the Capital Accounts; the state court, having found Yuba in default for not repaying the loans, entered judgment for Abuy as to repayment but (upon reconsideration) denied judgment to Abuy as to the adjustment of the Capital Accounts finding that such a remedy did not exist under the prommissory notes and/or the pledge agreement(s). The remedy it seeks today before this Court is allowable under the Operating Agreement and Abuy's pursuit of same was addressed by the Illinois state court. Exhibit 3 to Document #31. There was clearly no misleading of the Illinois state court and Yuba has always known that Abuy wanted a judicial adjudication of its purported right to adjust the Capital Accounts. Abuy is not judicially estopped from proceeding before this Court.

In light of the Court's factual findings, and there being no material issue of fact, and as a matter of law, the Court holds that plaintiff Abuy, pursuant to §§3.3. and 3.4 of the Operating Agreement, has the right to adjust the Capital Accounts and Percentage Interests of the Members based on Yuba's capital contribution default; and that this right was properly exercised and Abuy is now the 100% owner of YCM.

### Yuba's Counterclaims

In response to Abuy's claim for declaratory relief, Yuba filed a counterclaim in three (3) counts: Count I - breach of fiduciary duty; Count II - breach of contract; and Cournt III - declaratory relief . Abuy filed for summary judgment on Counts I and II of Yuba's counterclaim since Count III is essentially the same claim as the claim advanced in the plaintiff's complaint and the basis for the other two (2) summary judgment motions: i.e. whether or not Abuy had the right,

pursuant to the Operating Agreement, to adjust the Capital Accounts and Percentage Interests of Abuy and Yuba?[12]

Having reviewed Yuba's counterclaim (especially as to Counts I and II), the parties' pleadings on this matter, and the submitted exhibits, the Court finds that summary judgment shall be granted to Abuy.

Basic to these counts is Yuba's contention that Abuy wrongfully adjusted the Capital Accounts not in accordance with the Operating Agreement, that Abuy wrongfully initiated a lawsuit in Illinois to get Yuba declared in default by refusing to accept tendered payments on the outstanding loans, that Abuy "schemed" to get 100% ownership of YCM, and that Abuy "surreptitiously" courted offer(s) to develop the subject real property into an entertainment complex (a casino). The overriding problem with Yuba's counterclaim is a total lack of even minimal factual support for the allegations contained therein.

Firstly, the Illinois state court did find that Yuba failed to properly tender repayments of the outstanding loans, and therefore, was in default of the Operating Agreement. Given this finding, Yuba has amended its opposition to the instant summary judgment by withdrawing as grounds for its opposition its contention that Abuy breached its fiduciary duty by refusing to accept Yuba's offer(s) of repayment. *See,* Document #38, filed July 6, 2007.[13] Furthermore, Yuba has also withdrawn as a ground for its breach of fiduciary duty counterclaim its assertion that Abuy failed to inform Yuba of an offer to purchase and rezone the subject real property for residential housing. *See*, Document #38. Furthermore, in light of this Court's finding that Abuy properly and legally invoked its right to adjust the Capital Accounts to proportionately give it 100% ownership of YCM as of its April 28, 2006 notice to Yuba, Abuy had no obligation to advise or notify a non-member (Yuba) of any purported discussions or offers of alternative uses for the subject real property.

_____

[12]Having found in Abuy's favor on this issue, Count III of Yuba's counterclaim is dismissed.

[13]Albeit, in light of the filing of Document #38, Abuy's request to strike the Spach declaration (Exhibit E to Document #23) is somewhat mooted; for clarity of the record, the Court will grant the request and strike the Spach declaration.

Finally, a thorough review of the parties' pleadings, reveals that these two (2) Members in a common enterprise apparently both engaged in discussions with other prospective business investors/buyers outside the "knowledge" of the other Member. Both were seeking alternative uses for the subject real property, and evidently, both were talking to the same third-party.[14]

Having found no issues of material fact that would preclude granting summary judgment to Abuy on all counts as contained in Yuba's counterclaim, and as a matter of law, summary judgment will be granted to Abuy also as to Yuba's counterclaim.

In conclusion, the Court will grant summary judgment to plaintiff Abuy on its motion for summary judgment, and its motion for summary judgment on defendant Yuba's counterclaim; and deny summary judgment to Yuba on its motion for partial summary judgment.

Dated this ___16th___ day of April, 2008.

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[14]Abuy seeks to strike the Arceiro declaration in support of these counterclaim counts as being a "sham" declaration inconsistent with prior deposition testimony. The Court has reviewed the submitted deposition testimony of Frank Arciero and his later submitted declaration and agrees with Abuy that after testifying consistently of minimal discussion with the third-party regarding alternative plans for the real property, in his later declaraton, Mr. Arciero suddenly remembers at great length facts which support his opposition to Abuy's summary judgment motion regarding the Counterclaim. The Court finds that this declaration is a "sham" and fails to create any issue of disputed fact what would preclude summary judgment on these counterclaim counts in Abuy's favor. *See*, Wilson v. Westinghouse Elec. Co., 838 F.2d. 286, 289 (8th Cir. 1988); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d. 1361, 1365 (8th Cir. 1983).